IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL TRIPP                                                                                   PLAINTIFF

V.                                   CASE NO. 5:17-CV-05159

DEPUTY C. MORGAN;
DEPUTY JOSHUA HILL; and
DEPUTY MITCHELL SMOTHERS                                                     DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Tripp filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. Plaintiff is currently incarcerated in the East Arkansas Regional Unit of the Arkansas Department of Correction.

This case concerns an incident that occurred while Plaintiff was incarcerated at the Washington County Detention Center ("WCDC"). Specifically, Plaintiff maintains that on November 9, 2016, Deputies C. Morgan, J. Hill, and M. Smothers either used excessive force against Plaintiff or did not act to prevent the use of excessive force.

The case is before the Court on the Motion for Summary Judgment (Doc. 15) filed by the Defendants. Plaintiff filed a Response in Opposition (Doc. 20), and the Motion is now ready for decision.

### I. BACKGROUND

Plaintiff was arrested on September 30, 2016, and booked into the WCDC. (Doc. 17-2 at 5). Plaintiff denied he had any mental problems and indicated he was taking no medication at the time. (Doc. 17-4 at 2). On October 5, 2016, the nurse made a mental status note on Plaintiff's file because he was refusing "to communicate" and speaking "non-

sensical gibberish." *Id.* at 52. On October 6, 2016, a nurse noted that Plaintiff was acting like he did not speak English but "readily responded to the request to read his TB test." *Id.* On October 12, 2016, the nurse noted that Plaintiff acted like he did not speak English, preferred "non-sensical gibberish," but had books in his possession and responded to "commands for meals and count." *Id.*

On November 2, 2016, Plaintiff was added to "psych call" after it was noted he was acting strangely and being non-verbal and non-cooperative. (Doc. 17-5 at 52). The nurse called the Plaintiff's mother who indicated Plaintiff had a significant mental health history, including diagnoses of bipolar disorder and schizophrenia. *Id.* Plaintiff's mother reported that Plaintiff had spent thirty days at Northwest Behavioral Health in September. *Id.*

On November 3, 2016, Nurse Landon Harris spoke with Dr. Meakum at Northwest Behavioral Health, who indicated Plaintiff had been on Lithium and Zyprexa and had serious mental illnesses. (Doc. 17-4 at 51-52). Medications were ordered for Plaintiff that same day. *Id.*

On November 4, 2016, a social worker met with Plaintiff. *Id.* at 50. Plaintiff refused to talk, denied he was Michael Tripp, called himself Muhammad, and told the social worker to get away from his cell door. *Id.* The social worker noted that Plaintiff had spread feces on the wall of his cell. *Id.* An officer confirmed that Plaintiff's behavior had been becoming increasingly bizarre. *Id.*

On November 6, 2016, it was noted that Plaintiff had been refusing his Lithium and Seroquel medications. *Id.* at 48. These medications were discontinued. *Id.* He was prescribed Haldol to be given as an intramuscular shot every three weeks. *Id.* at 48-49.

On November 7, 2016, Plaintiff said he would not take the shot, but a note was made in his file that, at the time, he did not know where he was or his own name. *Id.* at 47. The decision was made to medically treat him based on his best interests. *Id.* As a precaution, two officers held his arm while the intramuscular shot was administered. *Id.* According to Nurse Harris, Plaintiff did not act aggressively or give any indication that he was upset. *Id.*

On November 9, 2016, a note was made in Plaintiff's file that he was drinking from the toilet and "protruding his tongue to drool." *Id.* at 47. Deputy Hill's incident report states as follows:

> On November 9, 2016 at approximately 3:08 pm I was in A Pod R Block putting a detainee back into his cell. The detainee out on his hour out said that R14 said he needed to see a nurse. I went to see what he needed; Detainee Michael Tripp . . . was leaning over the toilet with an empty milk carton dipping toilet water out and drinking it. I asked him what was wrong and then he went back to the toilet took his towel and dipped [it] in the toilet wiped the inside of the toilet and put the rag in his mouth and started sucking on it. He then walked to the door and said as if his tongue was swollen, his neck hurt because of the shot he got Monday. I went to pod control [and] called the nurse. Detainee Tripp walked to the door and then acted like he was going to fall. Deputy M. Smothers #489 and I caught Detainee Tripp and put him on the chair and the dinner table. The [nurse] came and evaluated Detainee Tripp. The nurse stated all vital signs were normal and he was ok to put him back into the cell.
>
> Smothers and I had to lift him and carry him to his cell. We laid him [on] the floor of his cell and shut the door. Smothers and the nurse left the block and I stayed in the block. I waited a minute and then went back to R14 cell and when I looked in Detainee Tripp had gotten up off the floor and was walking around his cell. When he noticed me he immediately started acting like he was hurt and then could not talk. I asked him if he was ok now since he had gotten up and he did not say anything. I continued my daily duties.

(Doc. 17-5 at 1).

This all occurred prior to the alleged use of excessive force.

### 1. Plaintiff's Version of the Incident

Later that same day, November 9, 2016, at approximately 4:30 pm, Plaintiff was involved in an altercation with Deputy Morgan. According to Plaintiff, he was having side effects from his medicine. (Doc. 17-9 at 16). Specifically, Plaintiff testified in his deposition that his neck and different parts of his body had been "locking up" at the time. *Id.* at 16, 18. Plaintiff believed his "nerves were just locking up and aching and hurting." *Id.* at 21. Plaintiff further testified that he was "high off the medicine"; he had a headache; and he could not stop his "arm from moving or [his] neck from turning." *Id.* at 18, 24-25. Plaintiff admitted that he flooded his cell because "they acted like they couldn't get no nurse at all to come see about the situation." *Id.* at 18.

While Plaintiff was talking to Morgan about his medical emergency and his request to see the nurse, he reached out and touched the silver part of Morgan's badge. (Doc. 17-9 at 16, 23, 31). According to Plaintiff, after Morgan touched him, he "touched him back because [Morgan] got to tussling me." *Id.* at 16; *see also id.* at 28 ("I grabbed him back."). Plaintiff stated that he was taken to the ground, and Morgan "hit [him] three times in the face while [he] was down." *Id.* at 18, 23. Plaintiff recalled that Hill was one of the officers holding him down. *Id.* at 33. Plaintiff believes Hill and another deputy who was present violated his rights by allowing Morgan to strike him while he was on the floor. *Id.* at 49. However, Plaintiff conceded during his deposition that the other, third officer who appears in the video recording of the incident was not Smothers. *Id.* at 49-50.

Following the altercation, Plaintiff testified that he was bleeding from his right eye, and he was not even given a bandage. *Id.* at 18, 37. However, Plaintiff indicated that a

deputy did bring him some ice. *Id.* at 39. Plaintiff also claims that it took a couple of hours for the bleeding to stop, he could not see from his eye for a couple of days, and his eye was swollen. *Id.* at 37. Plaintiff contends that he continues to suffer from headaches that he believes are related to the incident because of the location of the headaches. *Id.* at 41.

Plaintiff also testified that he frequently touched officers' badges if he needed something. *Id.* at 29. However, this was the first time he had done that with Morgan. *Id.* Plaintiff explained that he does not touch officers' badges at the Arkansas Department of Correction, where he is currently imprisoned, because he believes the officers there would perceive it as an assault. *Id.* at 29-30. But, according to Plaintiff, it was a different situation at the WCDC because his inmate "class" was not at issue there, so he did not worry about reaching for an officer's badge. *Id.*

When asked to describe what County policy or custom caused the alleged violation of his constitutional rights, Plaintiff explained that there is a County policy that once an inmate is in restraints, the deputies are not "supposed to swing on you." *Id.* at 50. Plaintiff indicated that all the proof he needs to establish his claim is on the video of the incident, and therefore, he does not intend to call any witnesses or present any documents to support his claim. *Id.* at 54.

### 2. Defendants' Version of the Incident

Deputy Morgan describes the incident as follows:

On November 9, 2016 at approximately 4:30 P.M., I was in R-block letting Detainee Michael Tripp out for his hour. When I opened Cell 14, I noticed water and wet books on the floor and water running into the day room. I approached the R-block slider and pushed the book cart into the hallway when I heard Detainee Tripp walking up behind me. I turned around and told Detainee Tripp to go take a shower. Detainee Tripp continued to approach

me as he reached up with his right hand to grab something on my shirt. I knocked Detainee Tripp's hand away and told him to back up as he reached for my shirt with his right hand. I pushed Detainee Tripp back away from me causing him to stumble backwards towards the stairs.

Detainee Tripp started coming back towards me with closed fist. I told Detainee Tripp again to go take a shower. Detainee Tripp continued to approach me with closed fist when he reached up with his right hand and tried grabbing my shirt again. I reached around Detainee Tripp['s] shoulders and tried forcing him to the ground. I was unable to get a good grasp of Detainee Tripp's shoulder so I forced him into the wall. Detainee Tripp wrapped his arms around me keeping me from gaining control of him. I struck Detainee Tripp in [the] right side of his face with a closed left fist. Detainee Tripp let go of me and I was able to force him to the ground. When Detainee Tripp and I landed on the ground, Detainee Tripp was face up and wrapped his arms around me again. Due to how close I was with Detainee Tripp, I was only able to control Detainee Tripp. Deputy Josh Hill #503 arrived and grabbed Detainee Tripp's hands along with Sergeant CJ Mitchell #425. We gained control of Deputy [sic] Tripp, rolled him over and put handcuffs on him. I rolled Detainee Tripp over, helped him stand and sit on a bench. Detainee Tripp had a swollen right che[ek]. The nurse arrived and said Detainee Tripp was fine but he would get an ice pack. We placed Detainee Tripp in ISO-2 to clean his cell up. Pictures were taken of Detainee Tripp's face and added to the incident report. The nurse arrived and brought an ice pack for Detainee Tripp. I handed Detainee Tripp the ice pack and noticed the swelling had gone up towards his eye. I informed the nurse and exited the cell.

(Doc. 17-5 at 5).

Morgan also completed a use of force incident report. *Id.* at 3. He reported having used a "weaponless defense tactic" that resulted in minor injury to the front of Plaintiff's head. *Id.*

Hill's incident report indicates that when he went into R Block, Morgan and Plaintiff were "fighting." *Id.* at 6. Hill explained that Plaintiff was on the floor and had grabbed Morgan's head. *Id.* For this reason, Hill grabbed both of Plaintiff's arms. *Id.*

Mitchell reported that he had been in the control room when he noticed Plaintiff fighting Morgan. *Id.* at 6. When Mitchell arrived in R Block, Plaintiff was on the floor and "still resisting." *Id.* Mitchell states that he ran in, grabbed Plaintiff's right arm, and handcuffed him. *Id.* Mitchell noted that Plaintiff had sustained an "injury to his right cheek bone while fighting." *Id.*

### 3. The Videos of the Incident

Defendants submitted a video exhibit containing footage from two separate pod cameras—one pointing towards the back of the pod and one pointing towards the pod door— as well as a video of the isolation room. (Doc. 17-6). The videos contain no audio.

The first video clip is from the camera aimed at the pod door. Morgan enters the cell block at 14:40 and moves to the back of the pod. This footage does not show what occurs at the back of the pod. Morgan comes into view again at 15:53 and begins wheeling the book cart towards the hallway. Plaintiff walks behind him. At the pod door, Morgan turns around and gestures toward the back of the pod. Plaintiff continues to approach until he is within arm's length of Morgan. At 16:06, Plaintiff reaches with his right hand and touches the chest pocket of Morgan's uniform shirt. Morgan grabs Plaintiff's right arm and pushes Plaintiff's left shoulder, shoving him back several feet. At 16:09, Plaintiff approaches Morgan a second time, gesturing with his right hand, and at 16:13, Plaintiff grabs Morgan's left forearm. At that point, Morgan grabs Plaintiff, and Plaintiff slips out of his grasp. Morgan spins around and grabs Plaintiff by the shoulders and pushes him against the wall. The two men struggle, and at 16:17, Morgan punches Plaintiff in the right side of his face. Plaintiff either falls to the floor or is forced down to the floor by Morgan.

Hill then enters the block and assists Morgan. At that point, Plaintiff is on the floor on his back, and Morgan has joined Plaintiff on the floor. Morgan rolls on top of Plaintiff's chest to hold him down as he struggles. Hill grabs one of Plaintiff's arms and attempts to secure both arms. At 16:26, Mitchell enters and joins the two other officers on the floor. All three deputies work to turn Plaintiff over on his stomach and handcuff him, as Plaintiff actively resists being cuffed and does not willingly give up his hands. The officers flip Plaintiff on his stomach on the floor at 16:44. By 16:56, Plaintiff is handcuffed and motionless, lying on his stomach on the floor, and the officers begin to disperse. The entire altercation lasts approximately one minute.

The video then shows Plaintiff being led to a seat at one of the tables and the nurse coming in the room to evaluate him. No treatment is given at this point. Plaintiff is then led out of the pod and does not appear on the remainder of this video.

The second video clip is shot from a camera aimed at the back of the pod. In this video, Morgan comes into view and approaches cell R 13. A prisoner enters the cell as Morgan stands by the door of the cell. Then Morgan shuts the cell door and moves to the next cell, R 14, where Plaintiff is housed. R 14 is located under a stairwell, and because of the camera angle, poor lighting, and poor quality of the video, it is difficult to see what occurs at the cell door. At 15:40, the door to cell R 14 opens. Plaintiff steps out of the cell and walks alongside Morgan, and then slightly behind him. Morgan walks toward the pod door, and Plaintiff follows at 15:52. The previously-described altercation between Morgan and Plaintiff takes place out of the view of this camera. Plaintiff comes back into view at 17:31, about a minute and a half after he first leaves the frame, and he appears to be

handcuffed and escorted by three officers. He is then seated at a table in handcuffs for a couple of minutes, waiting. At 19:54, the nurse appears in the camera's view.

The third video clip is from the perspective of the isolation cell located in A-pod. All footage from this camera is captured after the altercation between Plaintiff and the officers and will not be described for that reason.

### 4. The Use of Force Policy

The WCDC's use of force policy provides as follows:

> Only the amount of physical force necessary to maintain/regain control of a detainee shall be used by the staff of the Washington County Detention Facility. Physical force may be used only when an attack by a detainee(s) on a facility employee(s), visitor(s), or other detainee(s) is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective. Physical punishment of a detainee shall not be permitted under any circumstances.

(Doc. 17-7 at 1).

## II. LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to

raise a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

The Court must view all evidence and inferences in a light most favorable to the nonmoving party. *See McCleary v. ReliaStar Life Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

### III. DISCUSSION

#### A. Failure to Exhaust

Defendants' first argument in favor of summary judgment is that Plaintiff failed to exhaust his administrative remedies prior to filing suit. They claim that the undisputed evidence establishes that Plaintiff did not file a grievance regarding the November 9, 2016 incident until July 27, 2017, just three days before he filed the Complaint. Defendants point out that the WCDC detainee handbook requires a grievance to be filed within eight hours of the time the event complained of occurred.

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Exhaustion is mandatory. *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). In *Jones v. Bock,* 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust

administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

The WCDC detainee grievance procedure provides that grievances are to be submitted utilizing the kiosk in the cell block. (Doc. 17-7 at 4). It states that "[g]rievances shall be made promptly after the incident has occurred and will be addressed by the duty supervisor or forwarded up the chain of command." *Id.* With respect to the contents of the grievance, it is to "state fully the time, date, and names of those detention officers and/or staff members involved and pertinent details of the incident, including the names of any witnesses." *Id.*

The WCDC handbook provides as follows with respect to grievance procedures:

> You are allowed to file a grievance if you feel you have been subjected to abuse or an abridgment of your civil rights while being detained. All grievances will be done on the kiosk in your cellblock.
>
> A grievance must be submitted **within eight hours** from the time the event complained of occurred. The grievance should include:
> A. The date and approximate time of the event
> B. The name(s) of the person(s) involved
> C. The name(s) of any witness(es)
> D. Pertinent details of the event
>
> All grievances are reviewed by the Jail Administrator or their designee. If you feel your grievance was improperly handled, you may appeal to the Sergeant or Lieutenant.

(Doc. 17-8 at 19) (emphasis added).

Plaintiff testified at his deposition that during a previous incarceration, he used the kiosk, but he then he forgot how to use it once he was released from jail. (Doc. 17-9 at 43). Plaintiff stated that when he was incarcerated during the period of time in which the incident at issue occurred, an officer showed him how to use the kiosk, but he could not recall when this occurred. *Id.* Plaintiff testified that he did file a grievance about the incident involving Morgan; however, Plaintiff could not recall what he said in the grievance and only remembers that he "complained about the situation." *Id.* at 57. Further, he could not recall what month, day, or time he submitted the grievance. *Id.* at 43, 57. Finally, he recalls that he did receive a response to his grievance, and that response stated something to the effect that he should not touch an officer, and that is why the officers responded in the way that they did. *Id.* at 45.

There is no record of Plaintiff filing a grievance within the eight-hour window of the incident, as required by the WCDC handbook. However, Plaintiff was moved to an isolation cell with no access to a kiosk immediately after the altercation with the officers. Additionally, Defendants' records indicate Plaintiff was acting strangely just prior to the incident. Accordingly, in construing all disputes of fact in Plaintiff's favor and for purposes of summary judgment, the Court finds that Plaintiff's mental state after the incident made it difficult, if not impossible, to comply with the eight-hour time limit set forth in the handbook. *See, e.g., Mason v. Corizon, Inc.*, 2015 WL 10434528, *7 (W.D. Ark. Dec. 17, 2015) ("If, as a practical matter, one is unable to use or access a remedy due to physical or mental incapacity, it is logical to conclude that the remedy is not 'available.'").

However, by December 19, 2016, Plaintiff had access to a kiosk and understood how to use it, as demonstrated by the requests he submitted at that time. (Doc. 17-3 at 1). On December 31, 2016, Plaintiff made the first of multiple requests for a § 1983 form. *Id.* at 2. These requests do not mention the November 9 incident, name any of the Defendants, or mention the use of excessive force. Plaintiff filed his first grievance about the incident on July 27, 2017, and he filed his Complaint on August 9, 2017, less than two weeks later. The Court therefore finds that Defendants are entitled to summary judgment on the issue of exhaustion, based on Plaintiff's failure to submit a grievance through the kiosk system at the time he was mentally capable of doing so. However, for purposes of providing a complete record for review, the parties' remaining arguments will be addressed.

### B. Use of Force

The Supreme Court has held that a pretrial detainee's excessive force claim should be analyzed under an objective reasonableness standard.[1] *Kingsley v. Hendrickson, et al,* 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). In determining whether a given use of force is reasonable or excessive, the following factors may bear on the issue:

---

[1] Plaintiff was not convicted until August of 2017. (Doc. 17-9 at 16).

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and, whether the plaintiff was actively resisting.

*Id.* The above list is not exclusive, but instead illustrates the "types of objective circumstances potentially relevant to a determination of excessive force." *Id.*

In this case, Morgan gestured for the Plaintiff to get back and ordered him to do so. Plaintiff did not obey and continued to approach Morgan, reaching for Morgan's badge. Morgan then shoved Plaintiff back several feet back. At that point, it should have been clear to Plaintiff that he should remain back and not touch Morgan. Despite this, Plaintiff again approached Morgan and grabbed Morgan's forearm. In the altercation that followed, Plaintiff actively resisted Morgan's efforts to place him on the floor and to subdue and handcuff him. Once on the floor, Plaintiff continued to actively resist. Hill also entered the pod and went to the floor to assist Morgan in subduing Plaintiff. Then Mitchell, who is not a named Defendant, entered the pod and offered his assistance.

After careful review of the record, including the videos, the Court finds that there is no genuine issue of material fact as to whether the force used by Morgan was excessive under the particular circumstances of this case. This is not a case where an officer used force against an already subdued inmate or gratuitously applied force without a valid reason. Moreover, the video evidence is very clear as to the issue of Plaintiff's active resistance, and a reasonable juror could not come to a different interpretation. The Court therefore concludes that as a matter of law, the force Morgan used to subdue Plaintiff's active resistance to officer commands was objectively reasonable under the circumstances. Morgan is entitled to judgment in his favor.

With respect to Hill, Plaintiff maintains Hill had a duty to prevent Morgan from using excessive force. (Doc. 17-9 at 48-49). It is true that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). However, the duty exists only "where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009) (citations omitted).

When Hill entered the pod, Plaintiff and Morgan were already actively engaged in the altercation. Hill immediately went to the floor to assist in subduing Plaintiff. The circumstances were such that even if Hill perceived that Morgan was using excessive force, Hill did not have the opportunity to intervene. Hill is therefore entitled to judgment in his favor.

With respect to Smothers, as Plaintiff admits in his deposition, Smothers was not the third officer involved in restraining him. (Doc. at 49-50). Under § 1983, liability can only be established if a defendant was personally involved in the unconstitutional act, directed the unconstitutional act, or was involved in creating the policy or custom that was the moving force behind the unconstitutional act. *See, e.g., Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007); *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001). It is clear there is no basis on which to hold Smothers liable. Smothers is entitled to judgment in his favor.

Allowing Plaintiff to amend his Complaint to add Mitchell as a Defendant would be futile. Plaintiff's claim against Mitchell is the same as the claim he asserted against Hill. Mitchell arrived in the pod behind Hill and had even less of an opportunity to intervene.

### C. Official Capacity Liability

Plaintiff's official capacity claims are the equivalent of claims against Washington County. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Grayson v. Ross*, 454 F.3d 802, 810-811 (8th Cir. 2006) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiff has not alleged the existence of any custom or policy of Washington County that was a moving force behind the alleged constitutional violations. In fact, he asserts that the Defendants failed to follow Washington County's use of force policy. (Doc. 17-9 at 50-51). This claim therefore merits dismissal.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 15) is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**. Judgment will issue by separate order.

**IT IS SO ORDERED** on this 13th day of August, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE